**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
-------------------------------------------------------X

In Re:                                         CHAPTER 13

Linda K. Foster,                               Case No.: 08-14400 (MBK)

                                               Adversary No.: 08-2206

                          Debtor.
-------------------------------------------------------X


Linda K. Foster and Marie-Ann Greenberg,
Standing Chapter 13 Trustee,

                          Plaintiffs,


Matthew Schultz, Nader Allan, Financial
Resources, Inc., HSBC Bank USA, N.A.,
Mortgage Electronic Registration Systems,
Inc. and PNC Bank Consumer Loan Center,

                          Defendants.

-------------------------------------------------------X


**APPEARANCES:**

Stephen B. McNally, Esq.
McNally & Associates, L.L.C.
93 Main Street, Suite 201
Newton, New Jersey 07860
Attorney for Plaintiff Linda K. Foster, Debtor

Barbara K. Hager, Esq.
Reed Smith LLP
1650 Market Street
2400 One Liberty Place
Philadelphia, PA 19 103
Attorneys for Defendants HSBC Bank USA, N.A. and Mortgage Electronic
Registration Systems, Inc.

John P. Campbell, Esq.
Schenck, Price, Smith & King, LLP
220 Park Avenue
P.O. Box 991
Florham Park, New Jersey 07932
Attorneys for Defendant, PNC Bank, N.A.

**MICHAEL B. KAPLAN, U.S.B.J.**

**MEMORANDUM DECISION**

## I.   INTRODUCTION

This matter comes before the Court upon: (i) the Motion of Defendants HSBC Bank USA, N.A. ("HSBC") and Mortgage Electronic Registration Systems, Inc. ("MERS") (collectively "HBSC/MERS") for Summary Judgment and (ii) the Cross Motion of Defendant PNC Bank, N.A. ("PNC") for Summary Judgment (collectively the "Motions") to dismiss Counts I, II, IV, V, VI, VII, X, XI, and XII of Plaintiff Linda K. Foster's ("Plaintiff" or "Debtor") Amended Complaint.   For the reasons which follow, the Court grants Summary Judgment in favor of HSBC/MERS and PNC.

## II.   PROCEDURAL HISTORY/FACTS

In May 2006, Plaintiff received a notice (the "Notice") from her mortgage loan lender/servicer that she was several months behind in her mortgage loan payments on her home, located at 223 Bloomfield Ave, Unit 4B, Hoboken, NY (the "Property").   Plaintiff's mortgage payment was approximately $1,700.00 per month.   Upon receiving the Notice, Plaintiff began to look for means to refinance, but was unable to secure a loan from any lenders.   In June of 2006, Plaintiff's friend, Jerry Briley ("Briley"), referred Plaintiff to a mortgage broker, who in turn, placed Defendant Matthew Schultz ("Schultz") in touch with Plaintiff.   Shortly after speaking to Plaintiff on the phone, Schultz, along with Defendant Nader Allan ("Allan"), had a meeting with

Plaintiff where Schultz and Allan explained that they would be able to help Plaintiff remain in the Property.  Shultz proposed that his company -- Financial Resources -- acquire the Property as an alternative to refinancing, with the goal of preventing the Property from going into foreclosure.

Subsequently, in early July 2006, Plaintiff, Schultz, and Allan met at the Property and advised Plaintiff that the actual deal would be characterized as a "Lease Back with Purchase Option Agreement" (the "Agreement"), with Schultz purchasing the Property individually instead of through Financial Resources.  It was at this time that the Plaintiff signed and executed the Agreement.  On July 20, 2006, Plaintiff traveled to meet Schultz and Allan at the law office of George W. Pressler, IV, Esq. in New Brunswick, New Jersey for a closing.  At the closing, Plaintiff re-executed the Agreement and executed, among other documents, a Seller's Residency Certification and a HUD-1 Uniform Settlement Statement (the "HUD-1").  Specifically, the HUD-1 stated that the contract sales price was for $509,000.00, with net proceeds of $143,184.60 payable to the seller.  The underlying terms of the Agreement between Plaintiff, Schultz, and Allan were as follows: (1) Plaintiff's existing mortgage would be paid off in full; (2) Plaintiff would be able to remain in her home if she made monthly payments to Schultz; and (3) Plaintiff would have the option to buy the home back from Schultz at a later date.  Plaintiff also executed a Deed, dated July 20, 2006, transferring the Property to Schultz.  The Deed was recorded on August 17, 2006.

Schultz financed a portion of the July 2006 purchase of the Property at the closing with a purchase money mortgage loan (the "First Mortgage") in the amount of $329,265.00 from Worldwide Financial Resources, Inc. ("Worldwide").  The First Mortgage was also recorded on August 17, 2006, listing Schultz and Allan as the borrowers.  The First Mortgage lists MERS as

a nominee for Worldwide and its successors and assigns.  The accompanying note ("First Note") to the First Mortgage is endorsed in blank.  Following the closing, Plaintiff's mortgage to GMAC Mortgage Corporation ("GMAC") of approximately $170,000 was paid off with the proceeds from the First Mortgage.

On October 1, 2006, Wells Fargo became the Master Servicer of Nomura Asset-Backed Certificate Series, 2006-AF1 pursuant to a Pooling and Servicing Agreement (the "PSA").  The PSA contains information regarding the selling, purchase, deposit and transfer of mortgage loans from Nomura Credit & Capital, Inc. ("Seller" and "Sponsor") to Nomura Home Equity Loan, Inc. ("Depositor").  The mortgage loan schedule referenced in the PSA indicates that the First Mortgage on the Property was included in the transaction and deposited in the trust.  As of the closing of the mortgage securitization transaction, HSBC, as trustee, became the holder of the July 20, 2006 First Note for the benefit of the certificate holders of the Trust.  Since 2009, the First Mortgage has been in default. During the period between the initial execution of the Agreement and the July 20, 2006 closing, Plaintiff had no direct contact with HSBC/MERS or PNC.

On or about September 21, 2006, PNC made a loan of $200,000 (the "Second Mortgage") to Schultz, secured by a second mortgage against the Property.  PNC extended the line of credit with no knowledge of any issues relative to the transaction between Schultz and the Plaintiff.  Additionally, Plaintiff never directly communicated with PNC regarding any disputed issues relevant to the attachment of the Second Mortgage to the Property.  As of June 2009, a principal balance remained on the Second Mortgage in the amount of $196,816.10.

Following the July 2006 transaction, Plaintiff made her first payment to Schultz under the terms of the "Lease Back with Purchase Option Agreement."  Upon realizing that the payments

were treated as "rent," and would not be credited toward the re-purchase of the Property, Plaintiff ceased making further payments.  Plaintiff later tendered one additional payment to Schultz's attorney in the amount of $7,000.00, but took no further steps to reclaim the Property.

Plaintiff alleges that she is the victim of a Foreclosure Rescue Scheme perpetrated by Defendants Schultz and Allan.  She further contends that as an alcoholic, she was too impaired to understand the nature of the transaction and its consequences.  On March 12, 2008, the Plaintiff filed the within case under Chapter 13 of the Bankruptcy Code.  Subsequently, on September 11, 2008, Plaintiff filed her original Complaint against Defendants Schultz, Allan, Financial Consultants, Worldwide Financial Resources, Inc., and PNC.  On November 16, 2010, Plaintiff filed an Amended Complaint naming HSBC and MERS as additional defendants. The Amended Complaint asserts the following claims against HSBC, PNC and MERS:

- **Count I** – Recovery of Fraudulent Transfer under 11 U.S.C. § 548;

- **Count II** - Compelling Return of Property under 11 U.S.C. § 550;

- **Count IV** - Common Law Fraud, Aiding and Abetting Fraud;

- **Count V** - Civil Conspiracy;

- **Count VI** - Equitable Mortgage and TILA Violations;

- **Count VII** - Home Ownership and Equity Protection Act;

- **Count X** - Unjust Enrichment;

- **County XI** - Unconscionability, and

- **Count XIII** - Conversion.

On September 19, 2011, the parties filed their Motions.  To summarize, HSBC/MERS contends that Plaintiff has failed to establish the existence of a genuine dispute of material fact or legal basis sufficient to preclude entry of summary judgment in favor of HSBC/MERS.

HSBC/MERS contends that it was neither involved in the execution of the Agreement nor the origination of the loan, which Schultz used to purchase the Property. Indeed, HSBC/MERS submit that the record establishes that Plaintiff fully understood the ramifications of entering into the Agreement with Schultz and Allan, and that her alleged alcoholism did not impact her actions. HSBC/MERS further assert that they are holders in due course of the First Note, and, therefore, are shielded from any liability for the alleged wrongdoing of Schultz and Allan. Lastly, HSBC/MERS assert that Plaintiff does not have standing to bring a TILA or HOEPA claim against the Defendants, due to the lack of a borrower-lender relationship between the parties. Accordingly, HSBC/MERS ask the Court to grant their Motion.

With respect to the assertions made directly against it, PNC argues that Plaintiff cannot point to any evidence to establish that PNC had any knowledge regarding the Agreement entered into between the Plaintiff and Defendants Schultz and Allan. PNC asserts that it extended the $200,000.00 home equity line of credit to Schultz approximately two months after Schultz acquired the Property from Plaintiff, with absolutely no knowledge of any issues relative to the Agreement. As a result, PNC maintains that no grounds exist under any theory to avoid PNC's lien on the Property.

In response to the Motions, Plaintiff submits certifications that attempt to raise genuine disputes of material fact to preclude dismissal of her claims. Plaintiff contends that HSBC/MERS step into the shoes of Worldwide, and therefore, should be found vicariously liable for the actions of Shultz and Allan---alleged Worldwide employees. Additionally, Plaintiff asserts that she can establish a prima facie case for common law fraud in the factum and may avoid the Deed transfer to Shultz. Plaintiff states she did not understand the nature of the documents she was signing at the closing, and as a result of Shultz and Allan's fraudulent

6

misrepresentations, she transferred the Deed to Shultz.    Plaintiff further maintains that

Worldwide acted in concert with the alleged fraud perpetrated by Shultz and Allen, and that she

never received the net mortgage proceeds after executing the Agreement.    For these reasons,

Plaintiff claims that the Court may avoid the First and Second Mortgages under 11 U.S.C. §§

548 and 550.    Plaintiff concedes, however, that there are no facts that would impose vicarious

liability upon PNC for the alleged fraud perpetrated.    Instead, Plaintiff claims that PNC was

negligent in granting the Second Mortgage to Shultz for the purpose of "home improvement."

Plaintiff contends that the avoidance of title and the reimposition of an equitable mortgage are

remedies available for fraudulent foreclosure rescue scams, despite HSBC/MERS and PNC's

arguments to the contrary.

Further, Plaintiff argues that even if the Court finds that HSBC/MERS maintain holder in

due course status, they are not shielded from HSBC/MERS' real defenses such as duress and

fraud in the factum.    In this regard, Plaintiff raises incapacity as a defense to both Motions,

asserting that her alcoholism hindered her capacity to contract with Schultz and Allan regarding

the Agreement.    For the reasons which follow, the Court grants Summary Judgment in favor of

HSBC/MERS and PNC and dismisses Plaintiff's claims.

## III.   <u>JURISDICTION</u>

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(b),

1334(e)(1), and 157(a), and the Standing Order of the United States District Court dated July 10,

1984, referring all bankruptcy cases to the bankruptcy court. Plaintiff asserts in her Complaint

that this matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).   While many

causes of action appear to be noncore, the Court accepts the Plaintiff's pleading as consent to the

entry of a final judgment by this Court.   Venue is proper in this Court pursuant to 28 U.S.C. §§

1408 and 1409. The following constitutes the Court's findings of fact and conclusions of law as required by Fed. R. Bankr. P. 7052.[1]

IV.   **DISCUSSION**

   **A.  Summary Judgment Standard**

   Summary judgment is appropriate where "the pleadings, the discovery, and disclosure materials on file, and any affidavits show there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).[2] As the Supreme Court has indicated, "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (citing Fed. R. Civ. P. 1).   In deciding a motion for summary judgment, the judge's function is to determine if there is a genuine dispute for trial. Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 637 (3d Cir. 1993).

   The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. Huang v. BP Amoco Corp., 271 F.3d 560, 564 (3d Cir. 2001) (citing Celotex Corp., 477 U.S. at 323). In determining whether a factual dispute warranting trial exists, the court must view the record evidence and the summary judgment submissions in the light

---

[1] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

[2] Federal Rule of Civil Procedure 56 was amended as of December 1, 2010. As noted by the court in Guiliano v. Coy (In re Coy):

> Subdivision (a) now contains the summary judgment standard previously stated in subdivision (c). Fed. R. Civ. P. 56 Advisory Committee's Note to 2010 Amendments ("Subdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word—genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination.").

2011 Bankr. LEXIS 3196, *6-7 (Bankr. D. Del. Aug. 22, 2011).

most favorable to the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Issues of material fact are those "that might affect the outcome of the suit under the governing

law." Id. at 248. An issue is genuine when it is "triable," that is, when reasonable minds could

disagree on the result. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986) (citations omitted). If the moving party will bear the burden of persuasion at trial, the

party must support its motion with credible evidence - using any of the materials specified in

Rule 56(c) - that would entitle it to a directed verdict if not controverted at trial. Celotex Corp.,

477 U.S. at 331. Such an affirmative showing shifts the "burden of production" to the party

opposing the motion and requires the party to either demonstrate the existence of a "genuine

[dispute]" for trial or to request additional time for discovery under Fed. R. Civ. P. 56(f). Fed. R.

Civ. P. 56(e).

Once the moving party establishes the absence of a genuine dispute of material fact, the

burden then shifts to the non-moving party to "do more than simply show that there is some

metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. A party may not defeat

a motion for summary judgment unless it sets forth specific facts, in a form that "would be

admissible in evidence," establishing the existence of a genuine dispute of material fact for trial.

See Fed. R. Civ. P. 56(e) (providing that in response to a summary judgment motion the "adverse

party may not rest upon the mere allegations or denials of [its] pleading, but the adverse party's

response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing

that there is a genuine [dispute] for trial"). See also Fireman's Ins. Co. of Newark, N.J. v.

DuFresne, 676 F.2d 965, 969 (3d Cir. 1982); Olympic Junior, Inc. v. David Crystal, Inc., 463

F.2d 1141, 1146 (3d Cir. 1972). If the nonmoving party's evidence is a mere scintilla or is not

"significantly probative," the court may grant summary judgment. Liberty Lobby, Inc., 477 U.S.

at 249-50. The non-movant will prevail only if the evidence produced is of "sufficient quantum and quality" to allow a rational and fair-minded fact finder to return a verdict in his favor, bearing in mind the applicable standard of proof that would apply at trial on the merits. Id. at 249.

### B. Plaintiff's Claims Against PNC Are Dismissed

Plaintiff's Amended Complaint asserts identical claims against PNC as it did against HSBC/MERS, including:

- **Count I** – Recovery of Fraudulent Transfer under 11 U.S.C. § 548;

- **Count II** - Compelling Return of Property under 11 U.S.C. § 550;

- **Count IV** - Common Law Fraud, Aiding and Abetting Fraud;

- **Count V** - Civil Conspiracy;

- **Count VI** - Equitable Mortgage and TILA Violations;

- **Count VII** - Home Ownership and Equity Protection Act;

- **Count X** - Unjust Enrichment;

- **County XI** - Unconscionability, and

- **Count XIII** - Conversion.

The undisputed facts reflect that PNC extended the $200,000.00 home equity line of credit to Schultz without knowledge of any issues relative to the Agreement between Schultz, Allan and the Plaintiff.  This very fact is conceded by Plaintiff in her opposition to the Motions:

> PNC is, admittedly, a different situation. Plaintiffs are aware of no direct facts that would attribute knowledge of or vicarious liability for the fraud perpetrated upon the Debtor to PNC, except that PNC seems to have been entirely negligent in granting a $200,000.00 second mortgage for the ostensible purpose of "home improvement," see, Foster Cert., Exhibit S, p. 1.

See, Foster's Brief in Opp., Docket No. 48, p. 8.

10

The proofs submitted suggest quite the opposite; the record reveals that the Deed conveying the Property to Schultz and Worldwide's Mortgage were recorded, giving PNC no reason to suspect that a fraud had been perpetrated upon the Plaintiff.  In fact, Plaintiff never directly communicated with PNC, nor has she alerted the Court to any evidence that establishes that PNC maintained any knowledge regarding the Agreement.  Indeed, there is simply no basis for sustaining the allegations brought against PNC; no rational and fair-minded fact finder would return a verdict against PNC in Plaintiff's favor.  As such, the Court will dismiss all counts alleged against PNC in Plaintiff's Amended Complaint and grant Summary Judgment in its favor.  Due to PNC's adoption of HSBC's Statement of Undisputed Material Facts, and arguments in support of Summary Judgment, the Court applies to PNC its findings of fact and conclusions of law relative to the claims against HSBC/MERS.

### C.  Count IV: Common Law Fraud & Count V: Civil Conspiracy/Aiding And Abetting Fraud Of The Amended Complaint Are Dismissed As Against HSBC/MERS.

#### 1.  HSBC/MERS Retain Holder In Due Course Status Under N.J.S.A. §§ 9–102(b) And 3–302(a).

As a counter to HSBC/MERS' Motion, Plaintiff submits that HSBC/MERS are subject to her personal defenses with respect to the First Note, contesting that HSBC/MERS are holders in due course.  The party "claiming the rights of a holder in due course has the burden of establishing that he is . . . such a holder." In re Dixon-Ford, 2011 WL 6749083, *8 (Bankr. D.N.J. Dec. 21, 2011) (citing Gen. Inv. Corp. v. Angelini, 58 N.J. 396, 403-404, 278 A.2d 193 (1971)).  The Uniform Commercial Code, as adopted in New Jersey, provides that a holder in due course is "one who takes an instrument for value, in good faith, and without notice of dishonor or any defense against or claim to it on the part of any person." Wawel Savings Bank v.

Jersey Tractor In re Jersey Tractor Trailer Training Inc., 580 F.3d 147, 155 (3d Cir. N.J. 2009) (citing Triffin v. Pomerantz Staffing Servs., LLC, 370 N.J.Super. 301 (2004)); see also N.J.S.A. §§ 9–102(b) and 3–302(a).   "Good faith" means "honesty in fact and the observance of reasonable commercial standards of fair dealing." N.J.S.A. § 12A:3-103(a)(4). "[P]roof of circumstances calculated merely to arouse suspicion will not defeat recovery on a negotiable note taken for value before maturity; and bad faith, not merely suspicious circumstances, must be brought home to holder for value whose rights accrued before maturity, in order to defeat his recovery on a negotiable note upon ground of fraud in its inception or between the parties to it." Driscoll v. Burlington-Bristol Bridge Co., 8 N.J. 433, 86, A.2d 201 (1952), cert. denied, 344 U.S. 838 (1952).

A "holder," as set forth under N.J.S.A. § 12A:3-302(a)(1), includes a party who is "the holder of an instrument if . . . the instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity." N.J.S.A. § 12A:3-302(a)(l). "[T]o preclude liability from a holder in due course under [§] 3-302, it must be apparent on the face of the instrument that it is fraudulent." TriSJin v. Somerset Valley Bank, 777 A. 2d 993, 1000 (N.J. Super. App. Div. 2001).   As the court in Carnegie Bank explained:

> [ordinarily where the note appears to be negotiable in form and regular on its face, the holder is under no duty to inquire as to possible defenses . . . unless the circumstances of which he has knowledge rise to the level that the failure to inquire reveals a deliberate desire on his part to evade knowledge because of a belief or fear that investigation would disclose a defense from the transaction.

Carnegie Bank, 256 N.J. Super. 23, 35 (App. Div. 1992).

"The primary importance of the concept of holder in due course is with respect to assertion of defenses." N.J.S.A. § 12A:3-302 off. cmt. 4 (2010). "Holder in due course" status:

confers on a holder an ultimate right to the instrument held as against an obligor's "personal defenses"; that is, the right of the holder in due course to enforce the payment obligation is subject solely to an obligor's "real defenses"—defenses "of the obligor based on infancy . . . duress, lack of legal capacity, or illegality of the transaction which, under other law, nullifies the obligation of the obligor, fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms, or discharge of the obligor in insolvency proceedings[.]"

Bridges Fin. Group v. Beech Hill Co., Slip Copy, 2010 WL 3946529 (D.N.J. Oct. 5, 2010) (citing N.J.S.A. § 12A:3-305(a)(1) and off. cmt. 1 (2010)); see also Triffin v. Automatic Data Processing, Inc., 394 N.J. Super. 237, 247, 926 A.2d 362 (App. Div. 2007)).

After reviewing the record, the Court finds that there is no genuine dispute of material fact regarding HSBC/MERS' status as a holder in due course with respect to the First Note. First, HSBC/MERS is the holder of the note as the documentation conclusively establishes that the First Note was endorsed in blank and nothing in the record controverts HSBC/MERS' possession of the note.   Next, it is clear that HSBC/MERS took the First Note for value. Specifically, Plaintiff received: (1) $175,889.92 as a payoff of the GMAC loan plus legal fees; (2) $4,261.40 as a realty transfer fee; (3) $100.00 in recording charges; (4) $28,000 in cash paid out; (5) $5,748.00 for year of HOA fees (2006); (6) $33,033.07 in monies advanced by HSBC for future property taxes; (7) $18,000.00 for rent for tenant for the dates of July 2006 to about October 2007; and (8) the ability to live in the Property rent free for 5 years, valued at $61,667.00 (estimated at $1,200 per month based on what tenant was charged, minus the $3,333.00 and $7,000.00 payments to Debtor made to Schultz).

 In addition, there is not a genuine dispute of material fact as to whether HSBC/MERS took the First Note in good faith.  There is no evidence in the record that can establish that HSBC/MERS knew about Defendant Schultz and Allan's Agreement with Plaintiff.  Moreover, there is no evidence that HSBC/MERS took the First Note with knowledge of Plaintiff's claims

or defenses.  To the contrary, the Deed and Worldwide's Mortgage were recorded properly, thus

giving HSBC/MERS no reason to suspect that the First Note was fraudulently obtained.  Further,

the PSA produced by HSBC conclusively establishes that HSBC became the holder of the First

Note as part of a mortgage-backed securities transaction on behalf of the certificate holders of

the Trust, where a series of mortgage loans were deposited into the Trust.  Moreover, HSBC

received representations and warranties as part of the securitization transaction that all laws had

been complied with in the origination and servicing of the Mortgage Loan.  As to the instrument

itself, the Court finds that the First Note is free from any irregularity that would have alerted

HSBC/MERS to the existence of a potential fraud.  Accordingly, this Court determines that

HSBC/MERS are holders in due course of the First Note.

> ### 2.  HSBC/MERS Are Not Vicariously Liable For The Acts Of Schultz And Allan Under The Doctrine Of *Respondeat Superior*

Plaintiff seeks to hold HSBC/MERS vicariously liable for the acts of Schultz and Allan

under the doctrine of *respondeat superior*.  The record reflects that the Debtor understood that

she was selling her home to Schultz, and that based upon Schultz's representations, she believed

she would be able to repair her credit and obtain a new loan to buy back her home.  In Plaintiff's

Opposition, she states that her recollection is that Defendants Schultz and Allan told her that they

worked for Worldwide during the time in which the Agreement was consummated.  Plaintiff

contends that while Schultz's role changed from agent of Worldwide to buyer, Schultz still used

Worldwide, his employer, to make the loan.  Based upon this alleged disclosure, Plaintiff argues

that in acquiring the First Mortgage, HSBC/MERS stepped into the shoes of Worldwide, and

should likewise be subjected to the vicarious liability for the actions of Schultz and Allan,

Worldwide's employees.  Thus, Plaintiff seeks a ruling that: (1) HSBC/MERS do not enjoy

holder in due course status, (2) that Worldwide is vicariously liable for the actions of Defendants Schultz and Allan, and (3) that HSBC/MERS are vicariously liable for those same acts.

An employer can be found vicariously liable for the tortious conduct of an employee that is within the scope of his employment. Carter v. Reynolds, 175 N.J. 402, 409, 410–12 (2003). Conduct of an employee is within the scope of employment when "it is of the kind that he is employed to perform; it occurs substantially within the authorized time and space limits; [and] it is actuated, at least in part, by a motivation to serve the master." Roth v. First Nat'l State Bank, 169 N.J.Super. 280, 285, 404 A.2d 1182 (App.Div.), certif. denied, 81 N.J. 338, 407 A.2d 1212 (1979).   In support of her argument, Plaintiff cites to Licette Music Corp. v. Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, P.A., 2009 WL 2045259 (N.J.Super.A.D.), which held that "an employer can be held vicariously liable for the torts of its employee, even when the employee was acting outside the scope of his employment if 'the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.'" Licette Music Corp., 2009 WL 2045259 (N.J.Super.A.D.) (citing Hardwicke v. American Boychoir, 188 N.J. 69, 101 and n. 13, 902 A.2d 900 (2006) (quoting Restatement (Second) of Agency § 219); see also Restatement (Third) of Agency, §§ 2.03 and 3.03.)).

In Licette Music Corp, the New Jersey Appellate Division explained that a plaintiff can prove apparent authority by establishing:

> (1) that the principal has manifested his consent to the exercise of such authority or has knowingly permitted the agent to assume the exercise of such authority; (2) that the third person knew of the facts and, acting in good faith, had reason to believe, and did actually believe, that the agent possessed such authority; and (3) that the third person, relying on such appearance of authority, has changed his position and will be injured or suffer loss if the act done or transaction executed by the agent does not bind the principal.

2009 WL 2045259 at *9.   After considering the factors set forth by <u>Licette Music Corp</u>, the

Court finds no evidence of any employer/employee relationship between Schultz, Allan and

Worldwide, nor does the Court find that there are any proofs that have been submitted

establishing that HSBC possessed knowledge of the alleged acts committed by Schultz and

Allan.   Furthermore, nothing before the Court supports a finding that either Schultz or Allan

purported to act or speak on behalf of Worldwide, that Plaintiff relied upon such apparent

authority, or that Schultz or Allan were aided in accomplishing the tort by the existence of an

agency relation with Worldwide or HSBC/MERS.   Additionally, Plaintiff has not presented any

proofs by which a responsible fact finder could find that the Plaintiff thought, in fact, she was

receiving a loan from Worldwide by entering into the Agreement with Schultz and Allan.

### 3.   Plaintiff's Common Law Fraud Claim (Count IV) Cannot Be Sustained

Count IV of the Amended Complaint concerns Plaintiff's claim for common law fraud

against HSBC/MERS.   A claim for ordinary fraud, however, cannot defeat HSBC/MERS' holder

in due course status. <u>In re La Russo</u>**,** 2008 WL 2557500, *7 (Bankr. D.N.J. 2008) (citing <u>N.J.S.A.</u>

§ 12A:3–305(a)(2)).   "A holder in due course takes an instrument free of any personal defenses

the maker may assert against the payee." <u>In re Dixon-Ford</u>, 2011 WL 6749083 at *8. Similarly,

fraud in the inducement does not constitute a defense against a holder in due course under New

Jersey law. <u>Id.</u>   Therefore, because there is nothing before the Court suggesting fraud in the

execution or procurement of the First Note ---which would constitute a real defense, and thus,

could defeat HSBC/MERS' holder in due course status---the Court finds that this defense must

fail.   Accordingly, Plaintiff cannot sustain a claim for common law fraud as against

HSBC/MERS.

### 4. There Is No Factual Basis To Support A Claim Of "Civil Conspiracy" Against HSBC/MERS (Count V)

Plaintiff's claim for "civil conspiracy" similarly lacks any factual predicate. "In New Jersey, a civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.'" In re Reid, 2010 WL 3087513 *6 (Bankr. D.N.J. 2010) (citing Banco Popular N. Am. v. Gandi, 184 N.J. 161, 876 A.2d 253, 263 (N.J. 2005) (citation omitted)). The Third Circuit recognizes a four part test for the tort of civil conspiracy under New Jersey Law: "(1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful means; (4) proof of special damages." In re Reid, 2010 WL 3087513 *6 (citing Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C., 331 F.3d 406, 414 (3d Cir. 2003) (citing Naylor v. Harkins, 27 N.J. Super. 594, 99 A.2d 849, 855 (N.J. 1953))). Utilizing this test, the Court does not find any indicia of an agreement or that a common purpose existed by and between HSBC/MERS and the other Defendants to defraud Plaintiff.

### 5. HSBC/MERS Are Not Subject To Aider And Abetter Liability (Count V)

Plaintiff further contends that HSBC/MERS aided and abetted the alleged fraud committed by Schultz and Allan. To establish a claim for aiding and abetting, Plaintiff must demonstrate that HSBC, PNC and/or MERS engaged in: "(a) . . . a tortious act in concert with the other or pursuant to a common design with him or (b) . . . [knew] that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or  (c) . . . [gave] substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third

person." Ward v. Barnes, 545 F. Supp. 2d 400, 411 (D.N.J. 2008).  However, the "mere common

plan, design or even express agreement is not enough for liability in itself, and there must be acts

of a tortious character in carrying it into execution." State, Dep't of Treasury, Div. of Inv. ex rel.

McCormac v. Qwest Communications Intern., Inc., 387 N.J. Super. 469, 483 (App.Div. 2006).

In this case, the Court finds no evidence of any independent tortious act on the part of

HSBC/MERS, or any facts that would establish how they encouraged any acts of the other

Defendants.  As such, Plaintiff's claims against HSBC/MERS for civil conspiracy/aiding and

abetting are dismissed.

### D. No Equitable Mortgage Can Be Found To Exist Between Plaintiff And HSBC (Count VI)

Plaintiff additionally asks the Court to declare that an "equitable mortgage" exists

between Plaintiff and HSBC/MERS.  The doctrine of equitable mortgage has long been

recognized by New Jersey courts of equity:

> The whole doctrine of equitable liens or mortgages is founded upon that cardinal maxim of equity which regards as done that which has been agreed to be, and ought to have been, done. To dedicate property, or to agree to do so, to a particular purpose or debt, is regarded in equity as creating an equitable lien thereon in favor of him for whom such dedication is made. This wholesome equitable principle is one of wide, if not universal, recognition and application.
>
> The form which an agreement shall take in order to create an equitable lien or mortgage is quite immaterial, for equity looks at the final intent and purpose rather than at the form. If an intent to give, charge, or pledge property, real or personal, as security for an obligation, appears, and the property or thing intended to be given, charged, or pledged is sufficiently described or identified, then the equitable lien or mortgage will follow as of course.

In re O'Brien, 423 B.R. 477, 489 (Bankr. D.N.J. 2010) (citing Rutherford Nat. Bank v. H.R.

Bogle & Co., 114 N.J. Eq. 571, 169 A. 180, 182 (N.J. Ch. 1933).  In the past twenty years, New

Jersey courts have frequently found that sale-leaseback agreements made to avoid foreclosure are

in fact equitable mortgages. Johnson v. NovaStar Mortg., Inc., 698 F. Supp. 2d 463, 469 (D.N.J.

2010) (citing Essex Property Servs., Inc. v. Wood, 246 N.J. Super. 487, 587 A.2d 1337 (N.J. Super. Ct. Law Div. 1991)).

The District of New Jersey has recently ruled on a similar case involving a victim of a sale-leaseback scheme. In Scott v. DeMarco REI, Inc., 2011 WL 1327873, *3 (D.N.J. April 6, 2011), Judge Cavanaugh found that no equitable mortgage arose between the plaintiff and the straw purchaser's mortgage company.  Plaintiff sued the entity with which she had arranged the leaseback agreement and the mortgage company who had provided the mortgage to the straw purchaser, asserting claims for TILA violations against the mortgage company.  Id.  The mortgage company moved to dismiss, and plaintiff opposed, contending that an equitable mortgage existed between the mortgage company and herself.  Id.  Utilizing the case In re O'Brien, 423 B.R. 477 (D.N.J. 2010) in his analysis, Judge Cavanaugh discussed the multiple factors that the court must consider to determine whether the requisite intent is present to find an equitable mortgage, including:

> (1) Statements by the homeowner or representations by the purchaser indicating an intention that the homeowner continue ownership;
> (2) A substantial disparity between the value received by the homeowner and the actual value of the property;
> (3) Existence of an option to repurchase;
> (4) The homeowner's continued possession of the property;
> (5) The homeowner's continuing duty to bear ownership responsibilities, such as paying real estate taxes or performing property maintenance;
> (6) Disparity in bargaining power and sophistication, including the homeowner's lack of representation by counsel;
> (7) Evidence showing an irregular purchase process, including the fact that the property was not listed for sale or that the parties did not conduct an appraisal or investigate title; and
> (8) Financial distress of the homeowner, including the imminence of foreclosure and prior unsuccessful attempts to obtain loans.

Johnson, 698 F. Supp. 2d at 469-70 (citing In re O'Brien, 423 B.R. at 490-92).   After examining these factors, Judge Cavanaugh held that there was no allegation in the Complaint or any other

documentation provided to the Court that plaintiff and the mortgage company entered into any legal transaction. Id.  Judge Cavanaugh noted that the plaintiff never made any mortgage payments to the mortgage company, and that all payments were made directly to the rescue scheme planner as per the terms of the lease agreement. Id.  Accordingly, the O'Brien holding was inapplicable to the plaintiff's situation because it only established potential recovery against the party that engaged in the transaction with plaintiff, not the party that loaned money to a straw-purchaser borrower. Id. Therefore, the mortgage company's motion to dismiss was granted.

In this case, nothing before the Court suggests that there was any intent to create a mortgage between Worldwide and Plaintiff.  Indeed, Plaintiff directly communicated only with Defendants Schultz and Allan regarding the Agreement, and maintained no contact whatsoever with either HSBC/MERS or Worldwide during the course of the transaction.  Consequently, no responsible fact finder could find that Plaintiff thought she was getting a loan from either Worldwide or HSBC/MERS.  In fact, all of the payments Plaintiff made pursuant to the Agreement were directed to Schultz, and not to HSBC/MERS or Worldwide.  Likewise, Worldwide's intentions as the originator of the First Note and Mortgage are equally clear: Defendant Schultz applied for, and took out, the Mortgage. The Mortgage identifies Defendants Schultz and Allan as the borrowers and is executed in their names only.  Plaintiff has not demonstrated that a genuine dispute exists as to whether Plaintiff intended to enter into a mortgage transaction with Worldwide or HSBC/MERS.  Clearly, she did not.  Therefore, the Court grants summary judgment in favor of HSBC/MERS on this count and dismisses the claim.

**E.  Plaintiff Lacks Standing To Bring A TILA Or HOEPA Claim
Against HSBC/MERS (Counts VI and VII)**

Plaintiff additionally seeks compensatory damages and rescission of the First and Second

Mortgages predicated on alleged TILA and HOEPA violations committed by HSBC/MERS.

The purpose of TILA is to "assure that meaningful disclosures of credit terms to the consumer so

that they are able to compare the various credit terms available to him or her."  Psensky v.

American Honda Finance Corp., 378 N.J. Super. 221,225 (App. Div. 2005).  TILA provides

"when a loan made in a consumer credit transaction is secured by the borrower's principal

dwelling, the borrower may rescind the loan agreement if the lender fails to deliver certain forms

or to disclose important terms accurately." Marangos v. Swett, 2008 WL 4508542, *4 fn 4

(D.N.J.), aff'd, 341 Fed.Appx 752 (3d Cir. N.J., June 25, 2009).

HOEPA, on the other hand, is an amendment to TILA requiring special disclosures for

specific types of loans.  In re Community Bank of Northern Virginia and Guaranty National

Bank of Tallahassee Second Mortgage Loan Litigation, 418 F.3d 277, 304 (3d Cir 2005).  The

HOEPA protections and requirements extend only to the borrower of particular transactions, and

failure to comply with HOEPA entitles the borrower to specific remedies.  Id.  Specifically, in

order to show an injury under TILA and HOEPA, "Plaintiff must have been doing business with

Defendant." See Novastar, supra, 698 F.Supp. 2d at 468.  After reviewing the facts in this case,

the Court finds that Plaintiff lacks standing to assert a TILA or HOEPA defense against

HSBC/MERS because HSBC/MERS was not a party to any transaction involving the Plaintiff.

Both statutes create protections for a borrower in a transaction with a lender.  Here, as discussed

above, Plaintiff did not enter into a mortgage with either bank.  As such, Plaintiff cannot

establish standing to sue under TILA or HOEPA, and her claims are dismissed.

### F.  Plaintiff Cannot Establish An Unconscionability Claim Against HSBC/MERS (Count XI)

Count XI of the Amended Complaint alleges "unconscionability" as a bases to void the deed transfer and the attachment of the First and Second Mortgages to the Property.  "An affirmative defense of unconscionability can be sustained when a party shows that the contract terms are manifestly unfair or oppressive and are dictated by a dominant party." Hunter v. Sterling Bank, Inc., Slip Copy, 2011 WL 5921388, *8 (D.N.J. 2011) (citing Howard v. Diolosa, 241 N.J. Super 222, 230, 574 A.2d 995).  In order to assert this defense, there must have been a contract between the parties.  Plaintiff has conceded that she never entered into a contract with HSBC/MERS, and that her interactions were with Schultz, Allan and Financial Consultants. See Foster Cert., Docket No. 48, ¶ 22, 25-28.  Absent a contract with HSBC/MERS, the Plaintiff cannot raise this defense.  Once again, the Court finds lacking a genuine dispute of material fact regarding Plaintiff's claim for unconscionability, and dismisses Count XI of the Amended Complaint.

### G.  There Is No Factual Basis To Support A Claim Of Conversion Against HSBC/MERS (Count XIII)

Count XIII of the Amended Complaint alleges that Plaintiff "had a right to retain title to the Property" and that "[t]hrough their actions, each of Schultz, Allan, Financial Consultants, MERS, Worldwide, and/or HSBC and PNC were [sic] unlawfully obtained title to or an interest in the Property." See Foster Amend. Compl., Docket No. 29, ¶ 156-57.  "Conversion is a tort based on a defendant's exercise of dominion or control over property which is inconsistent with the plaintiff's rights."  Major Tours, Inc. v. Colorel, 799 F. Supp. 2d 376, 400 (D.N.J. 2011) (citing LaPlace v. Briere, 404 N.J. Super. 585, 962 A.2d 1139 (App. Div. 2009).

22

The Court cannot point to anything in the record that establishes that HSBC/MERS unlawfully obtained a security interest in the Property.  As previously held, HSBC/MERS are holders in due course and lawfully obtained possession of the First Note and Mortgage by way of a PSA.  Therefore, Plaintiff's claim for conversion must fail as a matter of law.

### H. Plaintiffs Claim For Unjust Enrichment Fails As A Matter Of Fact And Law (Count X)

Similarly, Plaintiff cannot establish an unjust enrichment claim against HSBC/MERS as the record does not support that either defendant unfairly retained a benefit to which they were not entitled.  Unjust enrichment is a theory of quasi-contractual recovery. Suburban Transfer Serv. v. Beech Holdings, Inc., 716 F.2d 220, 226-27 (3rd Cir. 1983).  To prove that the defendant has been unjustly enriched, the Plaintiff needs to show that the "[HSBC/MERS] . . . received a benefit and retention of that benefit without payment would be unjust."  VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994).

Plaintiff has failed to raise a genuine dispute of fact as to whether HSBC/MERS received a benefit without payment with respect to its acquisition of the First Mortgage.  Again, HSBC/MERS acquired the First Note and Mortgage as holders in due course and for reasonably equivalent value.  Plaintiff, meanwhile, continues to live in the Property without making any further payments to any of the Defendants for the amount due on the First and Second Mortgages. As such, Plaintiff's unjust enrichment claim against HSBC/MERS is dismissed.

### I. Plaintiff Cannot Avoid The Lien Of The Mortgage Loan On The Property Under 11 U.S.C. §§ 548 And 550 (Counts I and II)

Lastly, Plaintiff seeks to avoid the First and Second Mortgages, pursuant to 11 U.S.C. §§ 548 and 550.  Section 550 of the Bankruptcy Code permits the recovery of property of the estate after a transfer is avoided under § 548.  Section 548 provides, in relevant part, as follows:

23

(a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily–

> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; . . .

11 U.S.C. § 548.

The Court need not address whether Plaintiff can sustain a claim for fraudulent transfer under § 548 arising from the transfer of her property.  Rather, the issue is whether Plaintiff can recover from HSBC/MERS under 11 U.S.C. § 550.  Section § 550 provides that the value of a transfer, avoided under § 548, may be recovered for the benefit of the estate from "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550.   Here, HSBC/MERS would be characterized as a transferee of the "mediate transferee"---Worldwide--- under § 550(a)(1), by virtue of the acquisition of the First Mortgage on the Property.  Section 550(b) states that: "A trustee may not recover under section 550(a)(2) from - (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or (2) any immediate or mediate good faith transferee of such transferee." 11 U.S.C. §§ 550(b)(l) and (2).

Again, the record shows that Plaintiff received value in exchange for the transfer of the Property and Deed in the form of cash and satisfaction of a prior mortgage.   Further,

HSBC/MERS took the First Note and Mortgage for value and had no knowledge of Defendant Schultz and Allan's Agreement with Plaintiff.  Thus, even assuming that that the transfer of the Property to Schultz is a fraudulent transfer under § 548, there is no factual predicate to contest that HSBC/MERS took the First Note as a good faith transferee under § 550.  Therefore, the Court finds no grounds for the avoidance of the First and Second Mortgage under §§ 548 and 550.

### J.   There Is No Genuine Dispute Of Fact Regarding Plaintiff's Capacity to Contract

Lastly, Plaintiff asserts that her alcoholism hindered her capacity to contract with respect to the Agreement, and that summary judgment should be precluded at this juncture as a result. The record, however, suggests otherwise.  Plaintiff's certification demonstrates that she understood that the plan Schultz proposed was an "alternative to [her] refinancing the Property." See Foster Cert., Docket No. 48, ¶ 19.  In point of fact, Plaintiff's certification reveals that she fully comprehended the transaction by which Schultz would be purchasing her home ("on or about July 1, 2006 . . . I was advised the deal was slightly changing, in that the characterization of the agreement was going to be a "rent to own" and the purchaser of the property would be Schultz himself.").  Id. at ¶ 22.  Thus, she understood the nature of the transaction well before the closing took place.  Not only did Plaintiff sign the contract for sale weeks before the scheduled closing, but she also discussed the Agreement with a friend and thereafter decided to proceed with the transaction.  While Plaintiff's certification indicates that she may have been confused as to how her rental payments to Schultz were being credited towards purchasing back the Property, it is equally clear that she had the capacity to understand what was required to regain ownership of the Property.  Indeed, Plaintiff specifically stated "my hope to repay Mr. Schultz for saving the home was through the repair to my credit, which would enable me to borrow the money to

reinstate my mortgage or get a new mortgage." See Foster Resp. to HSBC. Rog 19, Docket No. 45; Foster Dep., 47:2-47:18, Docket No. 51.

Moreover, despite Plaintiff's claim in her certification that she consistently had been drinking during the period of time in question, it is apparent that her drinking did not interfere with her ability to travel to Metro Park, New Jersey, attend classes, and take exams to become licensed to sell insurance. See Foster Cert., Docket No. 48, ¶¶ 13, 17, 25; Foster Supp. Cert., Docket No. 54, ¶¶ 4, 5; Foster Resp. to MERS. Rog No. 11, Docket No. 45; Foster Dep. 128:4-13, Docket No. 51.  Plaintiff further contends that she drank on the day of the closing, yet she was able-bodied enough to take a train from Metro Park to New Brunswick to attend the closing at George Pressler's office. See Foster Supp. Cert., Docket No. 54, ¶ 7.  While Plaintiff maintains that her friend in real estate first advised her that she had in fact sold the Property to Schultz, Plaintiff took no steps to void the transaction until she filed this adversary proceeding on September 11, 2008, over two years after the July 20, 2006 closing. See Foster. Dep. 66:19-67:18; 77:2-19, Docket No. 51.

In support of her defense, Plaintiff submits an additional certification with attached exhibits, detailing instances of drinking and alcohol purchases around the time she entered into the Agreement.  See Foster. Supp. Cert., Docket No. 54, Ex. A.  The Court finds these proofs to be self-serving, as they do not establish that Plaintiff's "alcoholism" impacted her ability to contract on the day she entered into the Agreement, or proceed on the day of the closing.  While the daily purchases of alcohol are indicative of an alcohol problem, there is no evidence that she reached the level of intoxication necessary to be relieved of the consequences of her actions. Self-serving affidavits, without factual support in the record, will not serve to defeat a motion for

26

summary judgment.[3] Therefore, the court finds no genuine dispute of material fact concerning Plaintiff's capacity to contract when she entered into the Agreement with Schultz.

## IV.    CONCLUSION

The Court finds that Plaintiff has not produced a sufficient quantum of evidence to support a finding in Plaintiff's favor on the claims against PNC and HSBC/MERS.  Thus, the Court dismisses Plaintiff's Amended Complaint with respect to the claims asserted against HSBC/MERS and PNC.  The Court will enter the appropriate order.

Honorable Michael B. Kaplan
United States Bankruptcy Judge

Dated: March 7, 2012

---

[3] See Albiero v. City of Kankakee, 246 F.3d 927, 933 (2001) ("Under our precedent, these conclusory statements, unsupported by the evidence of record, are insufficient to avoid summary judgment. We repeatedly have held that '[s]elf-serving affidavits without factual support in the record will not defeat a motion for summary judgment.'"); see also, Unterreiner v. Volkswagen of Am., 8 F.3d 1206, 1210 (7th Cir. Ill. 1993) ("The statements are not sufficiently probative. see, Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993) ("self-serving affidavits without factual support in the record will not defeat a motion for summary judgment.")); see also, United States v. Spaulding Composites Co., 1997 U.S. Dist. LEXIS 24095, 6-8 (D.N.J. Jan. 22, 1997) ("Since a motion for summary judgment is designed to go beyond the pleadings, factual specificity is required of a party who opposes such a motion . . .  a party cannot rely upon self-serving conclusions, unsupported by specific facts in the record . . . [a] non-moving party must point to concrete evidence in the record which supports each essential element of his case.  If the party fails to provide such evidence, then he is not entitled to a trial and the moving-party is entitled to summary judgment as a matter of law") (citing Celotex, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986))).